Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS




)

 

DARIUS DAMASCUS BRIGGS,

)

 No. 08-01-00307-CR

)


 Appellant,

)

 Appeal from

)

 

v.

)

 358th District Court

)


THE STATE OF TEXAS,

)

 of Ector County, Texas

)


 Appellee.

)

 (TC# D-28,530)



O P I N I O N




 Darius Damascus Briggs appeals his conviction for sexual assault, enhanced as a habitual
offender. A jury found Appellant guilty and assessed his punishment at life imprisonment. In a
single point of error, Appellant contests the admissibility of his videotaped statement because it
included polygraph evidence and statements pertaining to his prior criminal record and sexual
offender registration. We reverse and remand the cause for a new trial.

FACTUAL SUMMARY


 L.S., the complainant, (1) worked at a 24-hour daycare facility in Odessa. On November 3, 2000,
she worked until midnight. After work, L.S. and her supervisor, Faye McCowan, went to a
nearby bar to have a beer. They stayed until 2 a.m. and went to another bar because McCowan
knew the people who worked there. They stayed at the second bar for approximately forty-five
minutes until it closed. While at this bar, L.S. met Appellant, whom she believed to be related to
McCowan. Appellant flirted with L.S. but she rebuffed him, stating she was old enough to be his
mother. When the bar closed and they walked outside to McCowan's car, Appellant asked for a
ride. McCowan agreed and he got in the car with them. McCowan dropped off L.S. by the side
of her apartment building and Appellant got out of the car to walk her to her apartment. L.S.
invited Appellant into her apartment and introduced him to her boyfriend, Joe Flores, and her
eldest son, Max. L.S.'s four-year-old son was asleep in an upstairs bedroom. While Appellant
went upstairs to the use the restroom, L.S. and Flores got into an argument because she was late
and had invited Appellant into the apartment. L.S. became nauseated from drinking and upset
with Flores, so she stepped out of the apartment to get some fresh air. She decided to walk to
McCowan's home located about one block away. As she crossed the street, Appellant walked up
behind L.S. and scared her. She told him that she was walking to McCowan's home and he
began walking with her. As L.S. began to cut across a church parking lot, Appellant grabbed her
by the arm and dragged her behind the church. He pushed her down on the ground between two
air conditioners, pulled down her pants and underclothes, and sexually assaulted her. L.S. begged
him to stop but he told L.S. to shut up or he would hurt her son. During the course of the assault,
Appellant twisted L.S.'s arms and legs and he made her dig in the dirt "like [his] people have
done." Appellant had difficulty maintaining an erection but he eventually ejaculated. After
Appellant pulled away from her, L.S. got up and ran back home while screaming hysterically. 
She fell in the door of her apartment screaming that she had been raped and that her youngest son
had been threatened. She attempted to call 911 but could not complete the call so Max spoke to
the dispatcher and asked for assistance. 

 At approximately 6:15 a.m., police officers and emergency medical services personnel responded
to the call. Those who observed L.S. described her as bruised, disheveled, and hysterical. (2) She
would not let anyone touch her. At the hospital emergency room, L.S. told Linda Pinter, the
nurse assigned to perform the sexual assault examination, that the assailant had made her dig in
the dirt and he had threatened to kill her four-year-old son. Pinter observed numerous bruises on
L.S.'s arms, legs, and torso and she found a superficial tear of the labia minora. In Pinter's
opinion, a tear in this area is consistent with sexual assault but not consensual sex. The
examination also detected the presence of sperm in the vaginal vault. 

 L.S. identified Appellant from a photographic lineup as her assailant. Following his arrest,
Appellant provided a voluntary videotaped statement to the police in which he admitted having
sexual intercourse with L.S. but maintained that it was consensual. At the apartment, L.S. asked
him to go upstairs into the bedroom and have sex with her. This angered her "husband" and son,
and they began to argue with her. Appellant and L.S. then left the apartment and walked over to
the church where they had consensual sex by the air conditioners. Afterwards, L.S. began to feel
guilty and afraid what her husband would do. 

 At trial, McCowan testified on Appellant's behalf. McCowan had known Appellant only a short
time before they ran into him at the bar. After they left the bar to go home, Appellant asked for a
ride and L.S. insisted that McCowan allow Appellant to ride with them. McCowan did not
understand why L.S. insisted, but she agreed to give Appellant a ride. It puzzled McCowan that
Appellant was going to L.S.'s apartment since she had a boyfriend who lived with her. When she
questioned L.S. about it, L.S. stated only that "we are going to do a little something something." 

 The jury rejected Appellant's defense and found him guilty of sexual assault as alleged in the
indictment. At the punishment phase, Appellant pled true to the two enhancement paragraphs,
and the jury found that he had previously been convicted of burglary of a habitation to commit
sexual assault in 1981, and attempted burglary of a habitation with intent to commit sexual
assault in 1989. The jury assessed punishment at life imprisonment.

ADMISSION OF THE VIDEOTAPED STATEMENT


 In his sole point of error, Appellant argues that the trial court abused its discretion in admitting
into evidence Appellant's videotaped statement because he made statements regarding his prior
criminal record and sexual offender registration, and Detective Arlie Jones asked whether
Appellant would submit to a polygraph examination. Appellant does not complain that his
videotaped statement was involuntary or that the requirements of Article 38.22 were not met.
Consequently, our discussion does not include those issues.

Standard of Review


 The trial court has broad discretion in determining the admissibility of evidence, and its ruling
will not be reversed on appeal absent a clear abuse of discretion. Allridge v. State, 850 S.W.2d
471, 492 (Tex.Crim.App. 1991), cert. denied, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68
(1993); Arzaga v. State, 86 S.W.3d 767, 773-74 (Tex.App.--El Paso 2002, no pet.). As long as
the trial court's ruling was at least within the zone of reasonable disagreement, we will not
intercede. Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(opinion on reh'g);
Arzaga, 86 S.W.3d at 774.



Polygraph Evidence


 At trial, Appellant objected to portions of the videotaped statement which mention a polygraph
examination. The first portion of the videotape contained, among other things, a statement about
Appellant's willingness to submit to a polygraph examination:

 [Appellant]: She said, 'This is my cool out spot. When I get mad at my son and my husband,' she
said, 'this is where I go.' And if I was on a lie detector machine, I wish I was hooked up to one
right now. Do you understand what I'm saying? Man, I know I got a bad record. You know
what I'm saying? I know I've been sent to prison for that -- them charges -- you know what I'm
saying? -- in my past. But, man, I'm telling you, didn't nothing go on right here. I have a fiancee.



Later during the interview, Appellant told Detective Arlie Jones that L.S. took him upstairs in
order to have sex with him. Jones then asked Appellant whether he would be willing to take a
polygraph examination and he replied that he would. Jones told Appellant that he could not
schedule the polygraph that evening but he would call the following day and set it up. He later
reiterated near the end of the interview that he would set up the polygraph the following day. In
response, Appellant asked Jones what would make him believe L.S. had lied to them. Jones
replied as follows:

 [Jones]: Well, for one reason, if you pass the polygraph. We'll go to the prosecuting attorney and
tell her that you passed the polygraph. 



The trial court overruled Appellant's objection for the stated reason that Appellant had been given
his Miranda (3)

 warnings and he had voluntarily made the statements. 

 Because polygraph testing is inherent unreliable and can be unduly persuasive, the results of
polygraph testing are not admissible for any purpose regardless of whether the evidence is offered
by the State or the defendant. See Nethery v. State, 692 S.W.2d 686, 700 (Tex.Crim.App.
1985);Perkins v. State, 902 S.W.2d 88, 93 (Tex.App.--El Paso 1995, pet. ref'd). Likewise,
evidence which reveals that a witness or defendant refused to submit to polygraph testing is
prejudicial and may improperly bolster another witness's testimony. See Washburn v. State, 167
Tex.Crim. 125, 318 S.W.2d 627, 637 (Tex.Crim.App. 1958)(op. on reh'g); see also Kugler v.
State, 902 S.W.2d 594, 597 (Tex.App.--Houston [1st Dist.] 1995, pet. ref'd).

 We first consider the State's argument that the entire statement, regardless of its contents, is
admissible because Appellant was given his Miranda warnings. The warnings required
byMiranda are designed to ensure that an accused's statements are voluntary. The statements,
though voluntary, may nevertheless be inadmissible for other reasons.

 The videotape does not directly state whether Appellant subsequently took the polygraph
examination or the results, if he did. Given Detective Jones' assurances to Appellant on the
videotape that he would schedule a polygraph examination and inform the prosecutor if Appellant
passed the polygraph, the jury could have logically drawn a conclusion from the fact that
Appellant was put to trial by the prosecutor that he failed the polygraph. (4) We are aware that not
every mention of a polygraph results in a finding of error or reversal. Several cases have found
no reversible error where a witness volunteered the information in a non-responsive answer, the
results of the test were not stated, and the trial court followed with an instruction to disregard. 
See e.g., Richardson v. State, 624 S.W.2d 912, 914-15 (Tex.Crim.App. 1981)(where complainant
stated in a non-responsive answer to prosecutor's question that she had taken a polygraph
examination); Hannon v. State, 475 S.W.2d 800, 803 (Tex.Crim.App. 1972)(witness gave
non-responsive answer that indicated he had been put on lie detector machine); Roper v. State,
375 S.W.2d 454, 457 (Tex.Crim.App. 1964) (officer disclosed that defendant had been given
polygraph exam); Barker v. State, 740 S.W.2d 579, 583 (Tex.App.--Houston [1st Dist. 1987, no
pet.)(officer stated that defendant had been offered a polygraph examination). In the instant case,
the State intentionally introduced the evidence over Appellant's objections and the jury was free
to consider it for all purposes. Consequently, we find that the evidence regarding the polygraph
examination is inadmissible.

Evidence of Prior Convictions and Sexual Offender Status


 Appellant also complains that the trial court refused to edit out the portions of his statement in
which he discussed his prior convictions and his status as a sexual offender. In addition to the
portion of the videotaped statement set forth above in which Appellant mentioned to Detective
Jones that he had previously been to prison, the following discussion is also found on the
videotape:

 [Appellant]: She sure was taking me up there to have sex. That is why her son was pitching a fit. 
You know what I'm saying?



 [Jones]: Well, I said I am going to talk to her about those things. Okay?



 [Appellant]: Because, see, this will get me in trouble. You know what I'm saying?



 [Jones]: I am not going to lie to you. If you are found guilty, yes, it can get you in trouble.



 [Appellant]: That's what I am talking about.



 [Jones]: And like I said, I know about that there is a past charge but I don't know what happened
on that past charge.



 [Appellant]: See, that's what I'm saying.



 [Jones]: All I know is --



 [Appellant]: And that's why I am not going to go and do nothing crazy like that. And I got a
fiancee. You know what I'm saying?



 [Jones]: All I know is that it was a 72 year old lady. The things of that case, I do not know. 
How long was that, ten years?



 [Appellant]: 1981.



 [Jones]: 1981?



 [Appellant]: Yes.



 [Jones]: Where was it at, where did it -- here in Odessa?



 [Appellant]: Yes, sir.



 [Jones]: About ten years ago, were you living in Odessa?



 [Appellant]: Yeah, I think so.



 [Jones]: Okay. And when did you go to prison?



 [Appellant]: I went in '81.



 [Jones]: For how long?



 [Appellant]: 15 years.



 [Jones]: You was in there for 15 years.



 [Appellant]: I had a 15 year sentence.



 [Jones]: Okay. So how long did you -- when did you get out?



 [Appellant]: I got out in '88.



 [Jones]: You got out in '88. Okay. And when you got out, you still lived here?



 [Appellant]: Yes. 



 On the videotape, Appellant made several references to having spent several years and "half [his]
life" in prison. Additionally, he referred to his "registration" and Jones, referring to Appellant's
"sexual . . . registration," asked him whether he had notified anyone about his change of
employment. In the face of Appellant's objection that the evidence violated Rule 404(b), the
State had the burden under Santellan (5) to satisfy the trial court that the evidence has relevance
apart from its character conformity value. The prosecutor argued that Appellant's prior record
was admissible on the issues of intent and motive and to rebut his consent defense. Asserting
that Appellant had previously been convicted for breaking into the house of a 72-year-old woman
and raping her, the prosecutor argued that Appellant is a "sexual predator" and the extraneous
offense evidence proves that Appellant's motive for committing these offenses is exercising
power over his victims. The prosecutor did not detail the other prior convictions Appellant
mentioned in his videotaped statement nor did he attempt to explain why that evidence was
relevant. The trial court overruled Appellant's objections that this evidence constituted
extraneous offense evidence and admitted the videotape in its entirety.

 As it argued in response to the contention regarding polygraph evidence, the State asserts that the
evidence is admissible because Appellant voluntarily made the statements after being warned
pursuant to Miranda. The State further argues that Appellant's prior convictions are admissible
on the issue of Appellant's intent and to rebut his defense of consent. As we have already held,
we are not persuaded by the State's initial argument. Even if Appellant voluntarily discussed his
prior convictions with the officers, the evidence must still satisfy the test for admissibility under
the law pertaining to extraneous offenses.

 In general, "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of
a person in order to show action in conformity therewith." Tex.R.Evid. 404(b); Smith v. State,
898 S.W.2d 838, 842 (Tex.Crim.App.), cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d
80 (1995). Rule 404(b), however, lists a number of exceptions to this rule. For instance, the
evidence may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident. Montgomery, 810 S.W.2d at 386. If the opponent of
the evidence objects on the grounds that the evidence is not relevant, violates Rule 404(b), or
constitutes an extraneous offense, the proponent must satisfy the trial court that the evidence has
relevance apart from its character conformity value. Santellan, 939 S.W.2d at 168. If the trial
court determines the evidence has no relevance apart from supporting the conclusion that the
person acted in conformity with his character, it is absolutely inadmissible. Montgomery, 810
S.W.2d at 387. On the other hand, the evidence is admissible if the proponent persuades the trial
court that the evidence tends to establish some elemental fact, such as identity or intent; that it
tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading
inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g., absence of
mistake or accident; or that it is relevant upon a logical inference not anticipated by the
rulemakers. See Santellan, 939 S.W.2d at 168-69;Montgomery, 810 S.W.2d at 387-388.

 The trial court is given wide latitude to admit or exclude evidence of other crimes, wrongs, or
acts. Montgomery, 810 S.W.2d at 390. Whether the evidence has any relevance apart from
character conformity is a question for the trial court. Montgomery, 810 S.W.2d at 390-91. In
order to admit the evidence, the trial court must conclude that the evidence tends in logic and
common experience to serve some purpose other than character conformity to make the existence
of a fact of consequence more or less probable than it would be without the evidence. Id. As
long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse
of discretion and the trial court's ruling will be upheld. Id. at 391.

Intent/Consent


 In a prosecution for sexual assault of an adult, the State must prove that the defendant engaged in
the conduct intentionally or knowingly without the complainant's consent. SeeTex.Pen.Code
Ann. § 22.011(a)(1), (b)(Vernon Supp. 2003). When the defensive theory of consent is raised in
such a prosecution, the defendant necessarily disputes his intent to engage in the alleged conduct
without the complainant's consent and thereby places his intent in issue. Rubio v. State, 607
S.W.2d 498, 501 (Tex.Crim.App. 1980); Wiggins v. State, 778 S.W.2d 877, 884-85
(Tex.App.--Dallas 1989, pet. ref'd). This intent cannot be inferred from the mere act of
intercourse with the complainant. Rubio, 607 S.W.2d at 502; Wiggins, 778 S.W.2d at 884-85.

 When the defendant's intent to commit the charged offense is at issue, the relevance of an
extraneous offense derives from the "doctrine of chances"--the instinctive recognition of that
logical process which eliminates the element of innocent intent by multiplying instances of the
same result until it is perceived that this element cannot explain them all. See Cantrell v. State,
731 S.W.2d 84, 90 (Tex.Crim.App. 1987). An unusual or abnormal element might be present in
one instance, but the more often it occurs the less likely it is to be the true explanation. See id. 
For the doctrine of chances to apply, there must be a similarity between the charged and
extraneous offenses, since it is the improbability of a like result being repeated by mere chance
that gives the extraneous offense probative weight. See Plante v. State, 692 S.W.2d 487, 492
(Tex.Crim.App. 1985). The degree of similarity required, however, is not as great when intent is
the material issue as when identity is the material issue and the extraneous offense is offered to
prove modus operandi. See Cantrell, 731 S.W.2d at 90; Wiggins, 778 S.W.2d at 885.

 Regarding Appellant's prior conviction relating to burglary and sexual assault of the 72-year-old
woman, the factual pattern between that case and the instant one are dissimilar. In the prior
conviction, Appellant broke into the elderly victim's home. Here, he met the 44-year-old
complainant in a bar and rode home with her and a friend. There is also a significant
dissimilarity in the ages of the victims. While there is some evidence that the assault of L.S. is a
racially-motivated crime, there is no similar evidence in the prior case. This lack of factual
similarity argues against admission of the prior conviction.

 The cases are also dissimilar in the sense that a reasonable argument cannot be made that the
prior offense involved consensual sex. If the facts of the prior conviction had been more similar
and Appellant had claimed in that case that the victim consented, then the doctrine of chance
would allow admission of the prior conviction. See e.g., Wiggins, 778 S.W.2d at 885-86 (where
the charged offense and extraneous offense involved similar facts, evidence of extraneous sexual
assault was relevant to defendant's claim of consent as, standing alone, either the charged offense
or the extraneous offense could conceivably have been unintentional, but it strained credibility to
assert that two such unintentional incidents occurred). We find that the trial court abused its
discretion in finding the prior conviction relevant to the consent/intent issue.

Motive


 While motive is not an essential element of a criminal offense, the State may always offer
evidence of motive because it is relevant as a circumstance tending to prove the commission of
an offense. Gosch v. State, 829 S.W.2d 775, 783 (Tex.Crim.App. 1991). Evidence offered as
proof of motive must, of course, "fairly tend to raise an inference in favor of the existence of a
motive on the part of the accused to commit the alleged offense." Rodriguez v. State, 486
S.W.2d 355, 358 (Tex.Crim.App. 1972). Thus, when offered to establish motive, the State is
required only to show the logical relevance of the extraneous offense in establishing a motive, not
to demonstrate a similarity between the primary offense and the extraneous offense. See Knox v.
State, 934 S.W.2d 678, 682-83 (Tex.Crim.App. 1996)(holding evidence of defendant's prior drug
use was relevant to show his motive for robbing a pharmacy); Porter v. State, 623 S.W.2d 374,
386 (Tex.Crim.App. 1981)(holding evidence that defendant had committed a robbery eleven days
earlier was relevant to show his motive).

 Extraneous offense evidence is generally admissible to prove motive in two instances: (1) when
a previous act is similar to the current offense and is committed against the same complainant or
class of complainants; (6) and (2) when a previous act is unlike the current offense but
demonstrates a motive for committing it. (7) We've already determined that the prior conviction is
not similar to the current offense and it was not committed against the same complainant or class
of complainants. The State urges the prior conviction demonstrates a motive for committing the
sexual assault against L.S. in that Appellant's motive in both cases was to exert power and control
over his victims. It is well accepted, however, that this is the underlying motive in every sexual
assault case. This is not the type of motive evidence displayed in Knox, Porter, or DeLeon and it
amounts to nothing more than propensity evidence. Consequently, the prior conviction is
inadmissible under Rule 404(b). Likewise, the evidence that Appellant had other convictions and
had spent a substantial portion of his life in prison is irrelevant for any purpose other than
showing he is a criminal in general. The trial court abused its discretion in overruling Appellant's
objections to these portions of the videotape.

Harm Analysis


 Having found that the trial court erred in admitting these portions of the videotaped statement,
we must next determine whether it is harmful. As a general rule, error in the admission or
exclusion of evidence does not rise to a constitutional level. Arzaga, 86 S.W.3d at 776.
Therefore, we apply the harmless error standard found in Tex.R.App.P. 44.2(b). Under this rule,
the erroneous admission of evidence warrants reversal only if the evidence had a substantial and
injurious effect or influence in determining the jury's verdict. See Morales v. State, 32 S.W.3d
862, 867 (Tex.Crim.App. 2000); King v. State, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). If
the error had no influence or only a slight influence on the verdict, it is harmless. Johnson v.
State, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998). However, if the reviewing court harbors
"grave doubts" that an error did not affect the outcome, that court must treat the error as if it did. 
United States v. Lane, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); Webb v. State,
36 S.W.3d 164, 182-83 (Tex.App.--Houston [14th Dist.] 2000, pet. ref'd). The United States
Supreme Court has defined "grave doubts" to mean "in the judge's mind, the matter is so evenly
balanced that he feels himself in virtual equipoise as to the harmlessness of the error." O'Neal v.
McAninch, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). If the reviewing court is
unsure whether the error affected the outcome, the court should treat the error as harmful, i.e., as
having a substantial and injurious effect or influence in determining the jury's verdict. Id. In
assessing the likelihood that the error adversely affected the jury's decision, we consider
everything in the record, including all testimony and evidence admitted for the jury's
consideration, the nature of the evidence supporting the verdict, the character of the alleged error,
and how the error might have been considered in connection with other evidence in the case. See
Morales, 32 S.W.3d at 867. We may also consider the State's theory of the case, any defensive
theories, closing arguments, and voir dire. See Morales, 32 S.W.3d at 867;Arzaga, 86 S.W.3d at
776.

 The focal issue at trial was L.S.'s credibility. The question before us is whether the inadmissible
polygraph and extraneous offense evidence improperly bolstered the complainant's testimony to
the degree that it had a substantial and injurious effect or influence in determining the jury's
verdict. Appellant challenged L.S.'s credibility through other witnesses who contradicted certain
aspects of her testimony. Although L.S. denied inviting Appellant to her apartment, McCowan
directly contradicted this statement. Appellant also attacked many aspects of the complainant's
testimony during cross-examination in his effort to not only challenge her credibility but also
raise his consent defense. Appellant focused particular attention on L.S.'s inability to adequately
explain the lapse of time from when she first arrived home sometime after 3 a.m. and when she
called the police at approximately 6 o'clock. In conducting our review, we are mindful that the
physical evidence corroborates L.S.'s testimony that a sexual assault took place. The jury saw
pictures of large bruises on L.S.'s ankles, legs, and shoulders and it heard testimony that two of
her teeth were cracked during the attack. Additionally, the sexual assault examiner found a tear
of the labia minora indicating blunt force trauma and non-consensual sexual intercourse. 
Testimony provided by L.S.'s family members, police, and emergency medical technicians
demonstrated that L.S. was hysterical, disheveled, muddy, and bruised when they saw her at
around 6:30 that morning. Additionally, two experts testified that L.S. has suffered from
post-traumatic stress disorder as a result of the incident. Despite the corroborative evidence,
however, we are troubled by the admission of the polygraph and prior sexual assault conviction
since any question the jury might have had regarding L.S.'s credibility or Appellant's guilty would
have surely vanished. Under the circumstances, we find ourselves with grave doubts as to
whether the inadmissible evidence had but a slight effect on the jury's verdict. Accordingly, we
sustain Appellant's sole point of error, reverse the conviction, and remand the cause for a new
trial. Upon retrial, the offending portions of the videotape should be redacted.





February 13, 2003 

 ANN CRAWFORD McCLURE, Justice



Before Panel No. 4

Barajas, C.J., Larsen, and McClure, JJ.



(Do Not Publish)

1. The indictment identified the complainant only by her initials.

2. The Rape Crisis Center subsequently referred L.S. to Dr. Harvey Durbin for assessment and
treatment. Dr. Durbin determined that L.S. suffers from post-traumatic stress disorder. Since the
assault, she has had difficulty sleeping, has lost her appetite, and has been extremely frightened
and fearful to the point that she is constantly checking doors and windows to be sure they are
locked. She also suffered from an inability to concentrate. With therapy and counseling over a
period of months, L.S. improved but she began regressing as the trial date approached. 

3. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).





4. During the hearing on Appellant's objections to the videotape, the State asserted that a
polygraph was set up but Appellant refused it. Appellant denied the prosecutor's statement
saying "No, that didn't happen." It is unclear from the record what actually occurred.

5. Santellan v. State, 939 S.W.d 155, 168 (Tex.Crim.App. 1997).

6. See Dillard v. State, 477 S.W.2d 547, 551 (Tex.Crim.App. 1971)(holding evidence of
defendant's prior violent acts against African Americans relevant to show motive); Hernandez v.
State, 900 S.W.2d 835, 838 (Tex.App.--Corpus Christi 1995, no pet.)(prior acts of sexually
abusing child were admissible in defendant's trial for abusing same child).

7. See Knox v. State, 934 S.W.2d 678, 682-83 (Tex.Crim.App. 1996)(evidence of defendant's
prior drug is relevant to show his motive for robbing a pharmacy); Porter, 623 S.W.2d at 386
(evidence that defendant had committed a robbery eleven days earlier is relevant to show his
motive for murdering the police officer apprehending him); DeLeon v. State, 937 S.W.2d 129,
136 (Tex.App.--Waco 1996, pet. ref'd)(evidence that defendant had previously stolen a car is
admissible to show his motive for assaulting a police officer who stopped him for speeding).